## E. P. DWIGHT ET AL., EXRS., v. ECKERT.

ERROR TO THE COURT OF COMMON PLEAS NO. 4 OF PHILA-
DELPHIA COUNTY.

Argued April 2, 1886—Re-argued March 22, 1887—Decided January 3, 1888.

1. In a contract for the sale and delivery of goods "free on board" vessel, the seller is under no obligation to act until the buyer names the ship to which delivery is to be made; but, where, by the nature or the express provisions of the contract, either the time or the place of delivery is at the seller's option, the seller becomes the actor, and it is his duty to give notice of the time or place of delivery before there is any obligation upon the buyer to name the vessel.
2. The rule requiring the buyer to name the vessel is satisfied when satisfactory shipping directions have been agreed upon and the means of transportation placed in the seller's hands; in such case the parties are governed by the contract directions, and until these are known to have failed, no other provision or designation will be required.

Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

Nos. 82, 83 January Term 1886, Sup. Ct.; court below, No. 417 December Term 1881, No. 212 September Term 1880, respectively, C. P.

On September 28, 1880, to No. 212 referred to, Isaac S. Waterman, trading as Waterman & Co., brought assumpsit against Henry S. Eckert to recover $45,834, with interest, being the balance due on account of steel blooms sold and

delivered by the plaintiff to the defendant. The pleas were non-assumpsit, payment and payment with leave. On December 31, 1881, to No. 417 referred to, Henry S. Eckert brought assumpsit against Isaac S. Waterman, trading as Waterman & Co., to recover $31,066.74, being damages (1) for defendant's failure to deliver 6400 tons steel blooms in time, as per contract; (2) for loss on sale of 3940 tons steel blooms delivered after time and received under protest; with a credit admitted of an amount due defendant on certain cargoes delivered prior to March 31, 1880. The pleas were non-assumpsit, payment with leave, set-off, etc. On April 7, 1883, the death of Isaac W. Waterman was suggested, and E. P. Dwight, Clara W. Dwight and John C. Bullitt, his executors, substituted.

Both causes were referred under the act of May 14, 1874, P. L. 166, to *Mr. Geo. Tucker Bispham*, as referee, who found the facts following:

On October 31, 1879, Messrs. Edward Samuel & Co., representing the London firm of Sanders Brothers, sold through Charles W. Mathews, of Philadelphia, a metal broker, to Messrs. Waterman & Co., a certain quantity of steel blooms, the particulars of the sale being set forth in a "sold" note, duly executed, of October 31, 1879, viz.:

Quantity, 5000 tons.

Brand or make, Bockum Verein. . . . . .

Price, five pounds fifteen shillings and sixpence sterling per ton, 2240 pounds. . . . . .

Place of delivery, free on board, continental ports.

Time of shipment, in equal proportions during the next five months.

Shipping directions to be given at such times as will enable deliveries to be made by the sellers, as above stated.

*Note.*—It is understood that the blooms are to be subject to purchaser's inspection at mill if required, and that the manufacturer's best quality for rail purposes is meant.

This "sold" note was signed by Charles W. Matthews, and his action was confirmed by a memorandum, in writing, at the foot thereof, signed by Messrs. Edward Samuels & Co., on behalf of their English principals.

To this contract of October 31 there was a supplementary

contract of November 17, 1879, the provisions of which were set forth in a "sold" note, duly executed, as follows:

Quantity, five thousand (5000) tons; size, 7 × 7.; weight, about 600 lbs. each, with latitude of about 3 p. in weight.

Brand or make, Bockum Verein.'''

Place of delivery, f. o. b., Rotterdam.

Time of shipment, about 1000 tons monthly, commencing Nov. '79, to Mar. '80, as nearly as may be.

Shipping directions, per steam vessels to Philadelphia, at 10s. 6d. per ton, for 4500 tons, as per freight contract in hands of Sanders Bros., and accepted here by Waterman & Co.

On November 5, 1879, Messrs. Waterman & Co. made another large purchase of steel blooms, this purchase being made from Messrs. Clark, Post & Martin, of New York, who had, in their turn, purchased them from Sanders Brothers. The terms were stated in the following "sold" note, viz.:

NEW YORK, November 5, 1879.

MESSRS. WATERMAN & Co., Philadelphia.

*Dear Sir:* We have this day sold to you steel blooms on the following terms, viz.:

Quantity, five thousand tons Bessemer steel blooms, 7 × 7, weighing about six hundred pounds each.

Quantity, from time to time during manufacture.

Price, five pounds eighteen shillings sterling per ton, twenty-two hundred and forty pounds, f. o. b., continental ports.

Delivery, about equal amounts monthly during November, January, February and March, including four hundred tons now shipping to Philadelphia.

CLARK, POST & MARTIN.

Accepted if, as represented, made from Cumberland pig iron.

(Signed)   WATERMAN & CO.,

CHARLES W. MATTHEWS.

The foregoing contracts called for ten thousand tons of steel blooms, and prior to January 15, 1880, certain deliveries, under the contracts, had been made, so that on the date last mentioned the amounts called for by the two contracts respectively were, by that with Sanders Brothers, 4366 tons, and by that with Clark, Post & Martin, 4534 tons; total, 8900 tons.

Messrs. Sanders Brothers were merchants in London; Messrs.

Clark, Post & Martin were doing business in New York; Messrs. Waterman & Co. were a Philadelphia house, and Mr. Henry S. Eckert was engaged in business at Reading, Pennsylvania; Mr. Matthews, as has already been stated, was a metal broker, doing business in Philadelphia.

On January 15, 1880, the following contract was executed by Mr. Matthews on behalf of Messrs. Waterman & Co., with Mr. Eckert, viz.:

> OFFICE, 133 WALNUT STREET,
> PHILADELPHIA, January 15, 1880.

Sold to Henry S. Eckert, Esq., for account of Messrs. Waterman & Co., eighty-nine hundred (8900) tons German blooms, as follows, viz.: About forty-three hundred and sixty-six (4366) tons Bockum make, and about forty-five hundred and thirty-four (4534) tons "Rhenish Company's" make Bessemer blooms, sizes $7 \times 7$, weight to be six hundred (600) pounds each, with a latitude of from two to three (2 to 3 ) per cent. either way, and deliverable during the months of December, A. D. 1879, January, February and March, A. D. 1880, f. o. b., vessel at continental ports, at seven pounds five shillings (£7 5s.) per ton of 2240 lbs., Rotterdam and Antwerp being ports meant. Sellers also agree to turn over a certain freight contract made to cover forty-five hundred (4500) tons of blooms, by steamer from Antwerp to this port, at ten shillings sixpence (10s. 6d.), deducting the amount of six hundred and thirty-four (634) tons from freight contract which are now in this port by "Zeeland." . . . . .

> CHARLES W. MATTHEWS, Broker.

Accepted, HENRY S. ECKERT.

Of the blooms sold under the above contract, 4366 tons were of those which had been bought by Messrs. Waterman & Co. from Messrs. Sanders Brothers by the contract of October 31, 1879, and its supplement of November 17 of that year; and 4534 tons were blooms purchased from Messrs. Clark, Post & Martin by the contract of November 5, 1879. The entire quantity of blooms, 8900 tons, was stated by the terms of the contract of January 15, 1880, to be deliverable during the months of December, 1879, January, February and March, 1880, free on board vessel at continental ports, Rotterdam and

Antwerp being the ports meant; and by the terms of the agreement it was provided that the sellers should turn over a certain freight contract made to cover 4500 tons of blooms by steamer from Antwerp to Philadelphia, at 10s. 6d., less 634 tons, which had already been shipped under the freight contract, and was then in Philadelphia, by steamer " Zeeland." This freight contract was that which is alluded to in the agreement of November 17, 1879, with the memorandum as to shipping directions at the foot of that contract already quoted.

Of the 8900 tons of blooms mentioned in the contract of January 15, 1880, there were delivered to the purchaser (Mr. Eckert) prior to March 31, 1880, 2489 tons. There were delivered after March 31, 1880, 3940 tons, which were received by Mr. Eckert under protest. There remained undelivered 2470 tons, which were not delivered in consequence of Mr. Eckert's allegation that the contract had been broken by the sellers, and his consequent refusal to accept the same, as will be hereafter particularly stated.

By the terms of the contract of January 15, 1880, the purchasers' credits were to be substituted for those of Waterman & Co. This provision in the contract was complied with by Eckert, who, on January 23, 1880, took out credits sufficient to cover the balance of the purchase money due by Waterman & Co. to their vendors on both contracts.

On March 1, 1880, Messrs. Clark, Post & Martin wrote to Mr. Matthews, advising him that they had received on that day a cable dispatch from Messrs. Sanders Brothers in regard to the blooms which were then coming forward on the contract between Clark, Post & Martin and Waterman, and stating that hardly any sail freight was available for Philadelphia; that they could ship by sail to New York more cheaply, and asking whether they might ship to New York or to Philadelphia at their option, and whether they should ship by sail or steam, advising, also, that " steam freight to Philadelphia was 20s. steam, to New York cheaper."

The blooms covered by the original contracts already referred to, seem to have been the property of Sanders Brothers, and the lot which was sold by Messrs. Clark, Post & Martin to the Messrs. Waterman was simply a lot to which they were entitled by virtue of a prior contract of purchase which they had made with Sanders Brothers.

It seems to have been the understanding of all the parties to these original contracts, viz.: Messrs. Sanders Brothers, Messrs. Clark, Post & Martin, and Messrs. Waterman & Co., that it was the duty of the purchaser to furnish vessels on board which the blooms were to be delivered by the sellers, or at all events to make some arrangements whereby the sellers would be advised as to the shipping which was to receive the blooms, and as to the port where such shipping was to be found. Accordingly, by the terms of contract between Messrs. Sanders Brothers and Messrs. Waterman, on November 17th, supplementary to that of October 31st, provisions were made for a shipment to the extent of 4500 tons, under certain freight contracts which were then in the hands of Sanders Brothers, and which were accepted as satisfactory by Messrs. Waterman & Co. Sanders Brothers were, therefore, apparently to attend to the shipping of the merchandise under the contracts which they had in their possession to the extent, at all events, of 4500 tons.

As to the other lot, that namely purchased from Clark, Post & Martin, it also appears that Messrs. Sanders Brothers undertook, as a matter of favor and without charge, to procure vessels for the shipment of that lot, the freights of course to be paid by the purchasers. There was a misunderstanding between Messrs. Sanders Brothers and Messrs. Waterman & Co. as to the extent of Messrs. Sanders Brothers' authority in this regard, the former being under the impression that they had authority to make shipping arrangements for the entire lot, the latter supposing that that authority extended only to a particular shipment. This understanding on the part of Sanders Brothers existed up to March 9, 1880, when they were informed that a different understanding had been supposed to exist by Waterman & Co. In other words, up to March 9, 1880, Sanders Brothers were under the impression that they were, as a matter of favor, to look after vessels for Waterman & Co.

After the purchase by Mr. Eckert had been effected through Mr. Matthews as the broker, Eckert seems to have given very little personal attention to it, that is, so far as related to the receipt, the handling and disposition of the blooms when they should arrive at Philadelphia. Mr. Eckert's statement of the

relations between Mr. Matthews and himself is as follows:
. . . . . Upon the consideration of the foregoing and other
evidence in the case, I find that in the correspondence hereafter
mentioned Matthews is to be considered as Eckert's agent.

Such, then, being the condition of things as to the arrange-
ments which had been made or had been supposed to be made
touching the shipping facilities on the other side, and such also
being the relation, viz., that of principal and agent for the
purpose of attending to shipping arrangements, which existed
between Eckert and Matthews, the next subject for considera-
tion is as to what passed between Matthews, acting for Eckert,
and Messrs. Clark, Post & Martin, Messrs. Sanders Brothers,
and Messrs. Waterman & Co.

The substance of the letter of March 1, 1880, to Matthews
from Clark, Post & Martin has been already given. It referred
to the blooms which were deliverable under the contract be-
tween Clark, Post & Martin and Waterman, and the dispatch
to which it referred was evidently sent by Sanders Brothers, in
view of the authority which had been given them to act on
behalf of Messrs. Waterman, and for the purpose of ascertain-
ing what their further action under that authority should be.
This letter of March 1st was answered by Matthews on March
2d, as follows : " I have placed myself in communication with
the parties in interest, and will advise you on receipt of their
replies."

The parties in interest referred to in this letter were evi-
dently Mr. Eckert.

On March 4, 1880, Clark, Post & Martin telegraphed to
Matthews as follows : " Our friends cable ' We wait answer
our cable. First blooms ready expenses accruing your ac-
count.' If you have nothing from Eckert had we not better
order them to New York, in view of high rates, Philadelphia.
Answer to-night."

To this telegram Matthews sent the following reply on same
day : " Must know amount of first shipment and date of ship-
ment before my friends decide. They prefer sail to steam
shipment and been offered at twelve shillings Antwerp or
Rotterdam. Answer and will give you instructions per cable.
Reply at once."

On the same day Matthews wrote to Clark, Post & Martin to the same effect, saying: " My friends object to steam shipments, and think that price given by your friends higher than the ruling market rates. I will advise you, however, positively to-morrow whether we or they can make the freight rates."

On March 5, 1880, Clark, Post & Martin telegraphed to Matthews advising him that the shipments made Zeeland, 149, Vaderland, 19, Venezuela, 602 tons blooms are f. o. b. Rotterdam.

On same day Matthews wrote to Messrs. Clark, Post & Martin, acknowledging the receipt of the telegram and saying: " Messrs. Waterman & Co. bought f. o. b. Rotterdam or Antwerp, with no specifications or orders as to shipments of same. I understand he authorized Messrs. Sanders Brothers to make shipments. My friends desire the blooms to be shipped by sail and not by steam. It was the duty of Sanders Brothers or yourself to notify my parties when they were ready to be shipped, so that they could provide transportation for same specially, as they have been offered by sail at not exceeding twelve shillings six pence per ton for the whole contract. I will, however, notify my friends of the shipments that have been made by the above-named vessels when I receive from you the rates of freight upon which such vessels have been taken up. If they see fit to accept such rates, I will notify you, but I must in their name protest against the assumption of Messrs. Sanders Brothers to make shipments and arrange freight rates for my principals. Upon receipt of your advices as to freight rates, of the vessels' names and date of shipments, I will advise you of my principals' decision."

On the next day, March 6, 1880, Matthews again wrote to Clark, Post & Martin, notifying them that Sanders Brothers had failed to make shipments according to contract; that it was their (Sanders Brothers') duty to notify his (Matthews') principals, " Waterman & Co., or Eckert, as you see fit to acknowledge, that they may be able to make their own freight arrangements; " and that " Messrs. Waterman & Co. insist that they should be advised when each lot of blooms is ready for shipment, that they themselves may have the opportunity of making the freight rate."

To this letter Clark, Post & Martin replied on March 8th,

saying that on the strength of correspondence with Messrs. Waterman & Co., in the previous November, they had cabled to Sanders Brothers to ship all the blooms to Philadelphia, and adding: "Now if you wish to vary these instructions Messrs. Waterman & Co. must give you authority for us to cable Sanders to cease making further freight contracts, and at the same time you must give us instructions as to whom Messrs. Sanders are to apply for vessels, as the blooms are ready to come forward."

On the same day, Clark, Post & Martin telegraphed to Matthews as follows: "Venezuela, six hundred two tons freight, twelve and six, sailing vessels."

On the same day Matthews wrote saying that the "Venezuela" shipment was satisfactory, and asking if Clark, Post & Martin had any freight rates on hand, as "his parties" would like "to make a contract for the entire balance of shipment."

On March 9, 1880, Matthews wrote to Clark, Post & Martin, acknowledging the receipt of their letter of the 8th, and saying that the supposed authorization by Waterman & Co. to Sanders Brothers to make freight arrangements was intended by the former firm to apply only to a temporary exigency. He added: "Regarding future shipments, Messrs. Waterman & Co. will accept a similar rate of freight, viz.: twelve shillings six pence for any blooms Messrs. Sanders Brothers may have on contract with you now ready for delivery or for delivery during this month, but they again most emphatically protest against any charge being made for expenses accrued from the storing or detention of blooms as estimated in your letter, would be the case."

On March 10, 1880, Clark, Post & Martin wrote in reply, saying that in their previous communication with Sanders Brothers as to freight arrangements they had acted simply as the mouthpiece of Messrs. Waterman, and that "we are now ready to have him instruct us as to what he wishes done in the matter, and we will communicate with Sanders Brothers." They also said in the same letter: "You must give positive instructions now as to the shipment of the balance that freight may not have been engaged for, as we will not accept or assume any responsibility in connection with this matter. We agree to deliver the stuff f. o. b., and it is the purchaser's

business to furnish vessels; and what we have done is simply from courtesy, and we have communicated to Sanders Mr. Waterman's instructions. Your intimation is that Mr. Waterman's protests are simply met by a counter-protest on our part. We will cable Sanders, if you wish, not to engage any more ships, but simply to notify Mr. John Jones, or any other person Mr. Waterman selects, that the blooms are ready for shipment.

On March 11, 1880, Matthews wrote to Clark, Post & Martin, saying that in consequence of Mr. Waterman's absence from Philadelphia the authorization which they desired could not be obtained, and adding: "Regarding the various points in your favor, they have been submitted to my principals, and doubtless will be settled to your satisfaction."

On March 16, 1880, Clark, Post & Martin wrote to Matthews, advising him that they were in receipt of a letter from Messrs. Sanders Brothers of March 3d, in which the following language was used: "We are sorry not to have received a reply from you respecting shipments of blooms lying at Antwerp to New York in place of Philadelphia. The goods are quite ready waiting shipment, and we fear that we shall have a heavy bill against you for expenses if they are not got there. The matter is so urgent that we have thought it advisable to cable you again to-night, and we hope in the morning to receive your definite instructions; of course the blooms cannot wait in Antwerp for an indefinite time without being paid for, and if they are not shipped speedily we shall have to get you to make some arrangements for payment to be made under credit."

Matthews, on March 18, 1880, wrote to Messrs. Clark, Post & Martin, as follows: "I have been advised by parties here that freights are readily obtained from Rotterdam, and in fact, they have been offered a contract to cover the whole balance to be shipped from that port, blooms at 13*s.* 6*d.* to Philadelphia, or 12*s.* 6*d.* (New York or Baltimore). I therefore desire that in your next cable you will advise Messrs. Sanders Brothers not to make the deliveries at Antwerp at additional expense at 1*s.* 6*d*, but make the shipments from Rotterdam at not exceeding that price before named, or in case they can't do that I am not in position to close the contract

for the balance. Please give me your views on this subject, as you see it is a very serious matter to my principals, making a difference of some 3s. or 4s. per ton, which you know at the present time is a profit."

On March 23, 1880, 998 tons and 1438 lbs. blooms were shipped by Sanders Brothers by the "Vaderland" from Antwerp, and were delivered on April 22, 1880. The shipments up to and including that of March 23, aggregated 2487 tons and 1187 lbs. The next shipment was made April 24th.

On April 27, 1880, Eckert, by letter of that date, notified Matthews, as the broker of Waterman & Co., that their contract to deliver blooms at Antwerp and Rotterdam during December, 1879, January, February, and March, 1880, f. o. b., had been broken by the failure to deliver 6377 tons at the ports named and within the time stipulated, and that he (Eckert) would look to Waterman & Co. to make good the loss.

On April 29th, Sanders Brothers cabled Eckert as follows: "Cable cash 350 pounds, bloom freight." Which was repeated on the next day.

On April 29th, Eckert replied by cable, as follows: "My contract with Waterman ended April 1st, will carry no more freight."

On May 13, 1880, another notice of Messrs. Waterman & Co.'s alleged breach of contract was given by letter from Eckert directly to them, the letter also containing a statement that as Eckert's outstanding credits with Brown, Brothers & Co. were being used to pay for the blooms, and as those credits would not expire until June 30th, he (Eckert) would receive all blooms delivered after April 1st, under protest, and sell the same for account of Waterman & Co.

The shipments from April 24 to June 26, 1880, aggregated 3940 tons 492 lbs., making a total, of all shipments, of 6429 tons 1679 lbs.

The amount which, under the contract, was payable by Eckert to Waterman for the $2487\frac{1187}{2240}$ tons delivered before March 31st, would be $17,513.33. The loss to Eckert on blooms delivered after that date was over $30,000.

From the findings of fact above set forth I draw the following conclusions:

Referee's Report.

[That of the blooms of the Sanders contract 4500 tons were covered, as to shipping directions, by the freight contract in Sanders Brothers' hands;][1]

[That the blooms of the " Clark, Post & Martin " contract were supposed by Sanders Brothers to be covered, as to shipping directions, by the arrangements made between Waterman & Co. and Sanders Brothers in November, 1879;][2]

[That Sanders Brothers were therefore, when the correspondence between Matthews and Clark, Post & Martin as to freight rates began, fully advised as to the port from which shipments were to be made, and as to vessels which were to receive the blooms; for these arrangements had been distinctly assumed by them, and they needed no further shipping directions from the vendees;][3]

That, as to the blooms of the Clark, Post & Martin contract, Matthews, as the representative of Eckert, alleged that they were not to be forwarded under the shipping directions which had been given or were supposed to have been given by Waterman & Co.;

That upon this position being assumed by Matthews, he was promptly requested by Clark, Post & Martin, acting for Sanders Brothers, to give new shipping directions on account of the purchaser, and was distinctly advised that the blooms were ready to come forward as soon as shipping directions were given;

That Matthews thereupon requested that deliveries should be made at Rotterdam, provided freight could be secured at or below a rate which he named, and asked to have Clark, Post & Martin's views on this subject;

That no reply was made to this letter; and that no explanation was given for the failure to make deliveries at Rotterdam in compliance with this request; and

[That the purchaser had therefore a right to suppose that the shipping facilities referred to by him could and would be secured, and certainly a right to suppose that he could not be considered in default until some reply had been received from the sellers to the effect that the proposed arrangement was unsatisfactory to *him.*][4]

Another general question of fact which was disputed was this, viz.: Was there any agreement between the parties that

the time within which the blooms were to be supplied according to the liberal terms of the contract was to be extended? Under this question I find the following facts: . . . [ I have considered the testimony on both sides and I am not satisfied that there is sufficient evidence to show any agreement to extend the time. I accordingly find as a fact that the time within which deliveries were to be made under the written contract was not subsequently or contemporaneously extended by any verbal agreement between the parties.][5]

In Waterman & Co. v. Eckert, 212 September Term 1880, the referee submitted the following, as his conclusions of law upon the foregoing facts:—

In Benjamin on Sales, it is said: " In the absence of a contrary agreement, the vendor is not bound to send or carry the goods to the vendee. He does all that he is bound to do by leaving or placing the goods at the buyer's disposal, so that the latter may remove them without lawful obstruction. And if the delivery by the vendor is to take place upon the doing of certain acts by the purchaser, the vendor is not in default for non-delivery until notice from the purchaser of the performance of the acts on which the delivery is to take place. Thus, if the vendor agrees to deliver on board of the purchaser's ship as soon as the ` latter is ready to receive the goods, the purchaser must name the ship, and give notice of his readiness to receive the goods on board, before he can complain of their non-delivery:" Benjamin, Sales, 1018.

Armitage v. Insole, 14 Q. B. 728, certainly seems to be an authority in support of this proposition; and Davis v. McLean, 21 W. R., 264, is an authority in support of the converse proposition that when something is to be done by the vendor, the purchaser is not in default until he has been notified that the action of the vendor has taken place.

It is believed that the proposition as stated by Benjamin is not in conflict with any English or Pennsylvania cases.

In Fleming v. Potter, 7 W. 382, and Santee v. Santee, 64 Pa. 479, there were no acts to be done by the party who was to receive the goods prior to the time when delivery was to be made by the other party, and hence the duty of delivery was held to be absolute; while in Fessler v. Love, 43 Pa. 313, the

time and place for delivery of the goods was fixed by the contract, and as nothing was to be done by the buyer, the court very properly said that the "contract was a demand." The same remark may be made as to Cullum v. Wagstaff, 48 Pa. 304, where the contract really "named the ship."

In Cassell v. Cooke, 8 S. & R. 268, the tender of the conveyance and the payment of the hand-money were said to be concomitant acts, and that being the case the vendor, on the one hand could not recover the purchase money without making a tender of the deed, while on the other hand the buyer could not enforce a conveyance without a tender of the purchase money; and in Pinkus v. Hamaker, 11 S. & R. 200, the same ruling was made in regard to a contract to deliver personal property. But can it be said that this decision has any application to a case in which the contract itself provides that, instead of the acts of vendor and purchaser being concomitant, the act of one of the parties should precede the act of the other?

I think, therefore, that the general rule must be taken to be that the purchaser, in an ordinary "f. o. b." contract, should name the ship.

Assuming, however, that the right proposition to start with is that the purchasers were to make arrangements to furnish vessels on board which the merchandise was to be delivered, and to notify the vendors that the vessels were ready, and that until this was done there was no duty, in respect of the delivery or even tender of the goods, resting upon the sellers, the question is whether in the present case arrangements to receive the goods on board vessels *were made* by the buyers, and whether notice of such arrangements *was given* to the vendors; and further, if any arrangements were made at all, how far did such arrangements modify the rule as stated.

There were two lots of blooms: One lot, amounting to 4366 tons, was that bought by Waterman of Sanders. The other lot, amounting to 4534 tons, was that bought by Waterman of Clark, Post & Martin, and which had been bought by Clark, Post & Martin of Sanders.

The first lot was originally (i. e., when sold by Sanders Brothers to Waterman) accompanied by a freight contract for 4500 tons, then in the hands of the vendors (Sanders), and

the "shipping directions" at the foot of the supplementary sold-note for this lot were "per steam vessel to Philadelphia at 10s. 6d. per ton for 4500 tons, as per freight contract in hands of Sanders Brothers and accepted here by Waterman & Co." The "sold" note to Eckert provided as follows: "Sellers also agree to turn over," etc.

[The effect of the existence of this freight contract in the hands of the original vendors, and the stipulations that Eckert was to have the benefit of it, and that it was to be used as the means of shipping 3866 tons (4500 less 634) from Antwerp to Philadelphia, was (as I understand it) equivalent to a provision made by the purchasers to have vessels at Antwerp ready to receive the merchandise and a notice to the sellers to that effect. The means of enabling the vendors to deliver "free on board" so far as 3866 tons were concerned, had been placed in their (the vendors') hands, for the port was named and the means of shipment indicated.

The rule as to "naming a ship" relied upon by counsel for Waterman & Co. was thus, I think, satisfied; and, in point of fact, the vendors did not ship enough blooms to fill this freight contract. I do not think, therefore, that Eckert can be considered in default, for the reason that the freight contract furnished by him was never exhausted.]⁶

In regard to the other lot of blooms, that namely which had been sold by Sanders Brothers to Clark, Post & Martin and resold by the latter to Messrs. Waterman & Co., it appears that the duty of furnishing shipping had been assumed by Messrs. Sanders Brothers, but that this assumption had been repudiated by Messrs. Waterman & Co. and by Mr. Matthews, who was then, I find, acting as Mr. Eckert's agent. If matters had rested here it might, possibly, have been Eckert's duty to have provided vessels and notified Waterman, or Sanders, or Clark, Post & Martin when they were ready, although even this is doubtful in view of the fact that the existing freight contract had not been exhausted. But after the repudiation by Matthews of Sanders Brothers' authority to bind Waterman or Eckert, he (Matthews) wrote to Clark, Post & Martin, requesting or instructing them to cable Sanders Brothers to procure vessels from a certain port and at a certain rate. To this request or instruction no answer seems to have

been made. [Now it was contended on behalf of Waterman & Co. that the right to choose between the alternate ports of delivery was vested in the purchaser, and that until he exercised that right and notified the vendors of his election, they could not be considered in default. But it seems to me that when Matthews, on Eckert's behalf, instructed Sanders Brothers, through Clark, Post & Martin, to "make the shipments from Rotterdam" (see his letter of March 18, 1880), it was, at least, the duty of Sanders Brothers (and consequently of Waterman & Co., who must be considered as responsible for Sanders Brothers' acts), to have the blooms at that port, and either ship them at the rates named or notify Eckert that they were ready for shipment. The duty of giving notice of readiness to perform the contract, if it rested on Eckert, was transferred by the letter just referred to, to the vendors.][7]

Especially is this the case in view of the arrangement which had theretofore existed, in Sanders' view of the matter, as to procuring freights.

[I think, therefore, that the purchaser could not under these circumstances be considered in default, and I think that the vendors were in default. If they could not deliver under the shipping directions which had been given, for any reason other than their own inability to comply with the contract, the duty of saying so would seem to me to devolve upon them, and Eckert might fairly charge them with default if they did not notify him of the existence of such a reason. Under such circumstances and after such a letter as that of Matthews, I do not think that the purchaser can be held to the rule of the ordinary "f. o. b." contract.][8]

[Under the above findings of fact and conclusions of law, Messrs. Waterman & Co. would be entitled to recover the amount payable to them under the contract of January 15, 1880, for the blooms delivered prior to April 1, 1880, to wit, $17,513.33, but as against this there should be set off the loss sustained by Eckert by reason of the failure of Waterman & Co. to complete the delivery of the 8900 tons of blooms before said date. This amount is ascertained in the finding in Eckert v. Waterman, filed herewith. It amounts to $48,649.36, with interest from March 31, 1880.][9]

[I find, therefore, generally, in this case for the defendant.][10]

Referee's Report.

In Eckert v. Waterman & Co., 417 December Term 1881, the referee reported as follows:

I find as facts in this case the facts found by me in the case of Waterman v. Eckert, Common Pleas, 4, No. 212 September Term 1880, a copy of said finding being hereto annexed.

The claim of Messrs. Eckert & Co. is made up of four items:—

1. A loss of profit on blooms delivered after March 31st, and which were received under protest.

2. A loss of profit on blooms not delivered at all.

3. A loss on the sale of blooms delivered after March 31st; and

4. A loss by reason of alleged failure to deliver blooms in equal monthly instalments.

Under the views expressed in the opinion in Waterman v. Eckert, I think that Messrs. Eckert & Co. are entitled to recover the first three items of their claim.

The first two items may be considered together. The total of blooms undelivered on April 1, 1880, was 6410 tons. The contract price with Waterman was £7 5s. 0d. per ton. Adding to this the duties and other expenses, and the cost to Eckert would be about fifty dollars to fifty-three dollars per ton. The market price of blooms between the date of the contract and the 31st March was about sixty dollars a ton, reached as high as sixty-two dollars per ton on the 20th March, but on the 29th March dropped to fifty-eight dollars and fifty cents. The liability of the defendant is probably to be fixed as of the 31st March. In fixing the price at that time to be between fifty-nine dollars and sixty dollars, I find as a fact that the loss to Eckert on the lot of 6410 tons, at, say seven dollars a ton, would be $44,873.29. As to the third item, I find as a fact that his loss on the sale of the 3940 tons which arrived late, was $3,776.07. The total of these items of loss is $48,649.36. From this amount is to be deducted the profit due to Waterman for the 2489 tons delivered in time, viz., $17,513.33, leaving the balance due to Eckert & Co. of $31,136.03, with interest from March 31, 1880.

I do not think that the fourth item of loss claimed by Messrs. Eckert & Co. can be taken into consideration. The contract did not provide for delivery of blooms in equal monthly instal-

ments. It simply provided that the blooms should be deliverable "during the months of December, A. D. 1879, January, February and March." It is true that in the contracts which were referred to in the contract of January 15, 1880, there are stipulations providing for deliveries in monthly instalments, but I do not think that those stipulations can be imported into the contract of January 15th. The reference in that contract to the preceding contract seems to me to be simply for the purpose of identifying the analysis and mechanical test of the blooms, or rather for fixing a standard for such an analysis and test, and not for the purpose of incorporating the terms of the earlier contracts into the agreement between the parties to the present suit. Under this view, and in the absence of any demand on the part of Eckert for equal monthly deliveries, I do not think that the vendors were in any default because the deliveries were not in equal monthly instalments. Their default (as I have already found) consisted in a failure to deliver within the proper time, viz.: four months. This view seems to be justified by the language of the decision of Bergheim v. Glenhaven Iron & Steel Company, Limited, L. R., 10 Q. B. 319, to which I was referred by the plaintiff's counsel.

In this case, therefore, I find for the plaintiff in the sum of $31,136.03, with interest from March 31, 1880.

In each of said cases Waterman & Co. filed exceptions, that after correctly finding the facts

1–3. The referee erred in his conclusions.[1] [2] [3]

4–10. The referee erred in the parts of his report in [ ] [4 to 10]

The referee overruled the exceptions, and in No. 212 directed judgment to be entered for the defendant, and in No. 417 directed judgment to be entered in favor of the plaintiff for $41,442.04, whereupon Waterman & Co. took these writs assigning as errors in each case the overruling the said exceptions and the orders entering said judgments.

*Mr. Samuel Dickson* and *Mr. Richard C. Dale*, for the plaintiffs in error:

By a f. o. b. contract, the seller agrees to deliver "free on board" a vessel to be furnished by the purchaser, at a port or one of the ports named. Until the seller receives from the pur-

chaser the name of the vessel, the dock where the vessel is to lie, and the time when the delivery can be made, no obligation rests upon the seller to make delivery, or even to inform the purchaser that he is ready to deliver: Armitage v. Insole, 14 Q. B. 728; Wackerbarth v. Masson, 3 Camp. 270; Wetherill v. Cope, 3 Camp. 272; Sutherland v. Allhusen, 14 Law Times, N. S., 666; Kunkle v. Mitchell, 56 Pa. 100.

*Mr. G. Heide Norris* and *Mr. Geo. F. Baer*, for the defendant in error:

1. The rule of law is, that where a contract calls for alternate ports of delivery, it is the duty of the vendors, in the first instance, to designate the port at which they desire vessels furnished: 2 Pars. Con. 657; 1 Co. Inst. A.; Layton v. Pearce, Doug. 16; Davies v. McLean, 21 W. R. 264 (28 L. T., N. S., 113); Rogers v. Van Hoesen, 12 Johns. 221.

2. In such a contract as this, it was the duty of the vendors, at all events, to notify the purchaser of the time the blooms would be at the port, before the purchaser could be required to furnish the vessels: Benj. Sales, § 1023, n.; Santee v. Santee, 64 Pa. 478; Roberts v. Beatty, 2 P. & W. 67; Fleming v. Potter, 7 W. 380; Cleveland v. Sterrett, 70 Pa. 204; Keeler v. Schmertz, 46 Pa. 139; Benj. Sales 886; Council Bluffs Iron Co. v. Cuppy, 41 Iowa 104; Benjamin v. Blænavon, L. R. 10 Q. B. 324.

Number 83.

OPINION, MR. JUSTICE CLARK:

Upon which of the parties to what has been termed the "sold note" of January 15, 1880, rested the obligation to act first? It is a well established principle of the law, that in a contract for sale and delivery of goods, "free on board" vessel, the seller is under no obligation to act, until the buyer names the ship to which the delivery is to be made; for until he knows that, the seller could not put the goods on board: Armitage v. Insole, 12 Q. B. 728; Wackerbarth v. Masson, 3 Camp. 272; Sutherland v. Atkinson, 14 L. T., N. S., 666; Walton v. Black, 5 Del. 149. The rule is illustrated in our own case of Kunkle v. Mitchell, 56 Pa. 100, where the contract was, that Mitchell would "deliver on the cars, at Indiana, 75,000 feet of lumber at eighty-five cents per hundred feet."

" This was the controlling clause as to the place of delivery," says Mr. Justice READ: " the cars would be either the cars of the plaintiff, or those of the railroad company, and in either case they were to be provided by the plaintiff and not by the defendant."

But where either the time or the place of delivery is by the nature of the contract, or by its express provisions, at the seller's option, a different rule must necessarily prevail ; in such case, the seller becomes the first actor, and it is his duty to give notice of the time or place, or both, as the case may be, at which it is proposed to deliver the goods, before any obligation rests upon the buyer to name the ship, upon board of which they are to be delivered ; for until the seller declares his election as to time and place, the buyer could not know when or where to have the vessel ready : Brooklyn Oil Refinery v. Brown, 38 How. P. 444 ; Rodgers v. Van Hoesen, 12 Johns. 221 ; Benj. on Sales, 1023.

We do not understand these general principles of the law to be either doubted or denied ; they are founded in the usages and necessities of trade, and are of general application.

Referring to the contract upon which this suit is brought, we find that Waterman & Co., on January 15, 1880, sold to Henry S. Eckert eighty-nine hundred tons of German blooms ; 4366 tons Bochum make, and 4534 Rhenish Company's make, Bessemer blooms, " deliverable during the months of December, A. D. 1879, January, February, and March, A. D. 1880, f. o. b. vessels in continental ports, at seven pounds five shillings (7 pounds 5 shillings) per ton of 2240 pounds ; Rotterdam and Antwerp being ports meant."

It is contended, in the first place, on the part of Eckert, the defendant, that, as to the 4366 tons of Bochum blooms the rule requiring the buyers to name the vessel was satisfied by the special provisions of the contract. It is conceded that these were the same blooms which Sanders Brothers by the sold note of October 31, 1879, and its supplement of November 17th, in the same year, had transferred to Waterman & Co. The contract of the latter date contained the following clause :

" shipping directions, per steam vessels to Philadelphia at 10*s.* 6*d.* per ton for forty-five hundred tons, as per freight contract in the hands of Sanders Brothers, and accepted by Waterman

& Co." This freight contract was not in evidence, but the fact of its existence is admitted, and this was all that was attempted to be shown. It is clear, certainly, that as between Sanders Brothers and Waterman & Co., transportation was to this extent in some way provided for. The contract was "in the hands of Sanders Brothers," the shippers, and was "accepted by Waterman & Co.," and the shipping directions, pro tanto, were in accordance with it. On the 15th January, 1880, Waterman & Co. sold the same blooms to Eckert, and agreed to turn over the freight contract to him, referring to it as "covering forty-five hundred tons of blooms, by steamer from Antwerp to Philadelphia, at ten shillings six pence per ton, deducting 634 tons in port by Zeeland." The sold note of November 17, 1879, was, or was to have been, appended to the contract in suit; and it is plain, we think, that the parties supposed the shipping directions to the extent of this freight contract to be complete. The freight contract was for transportation of blooms from Antwerp, one of the ports of delivery agreed upon by the parties, to Philadelphia; and the transfer of it being part and parcel of the transaction involving the sale, was without doubt referable to the transportation of the particular blooms which were the subject of the sale.

The rule requiring the buyer to name the ship is, of course, satisfied when satisfactory specific shipping directions have been agreed upon and the means of transportation placed in the seller's hands; in such case the parties are governed by the directions expressed in their contract, and until these are known to have failed no other provision or designation will be required. We think the learned referee was right in holding that the transfer of the freight contract in the hands of Sanders Brothers to Eckert, and his acceptance of it, was a complete provision on his part, to that extent, for vessels at Antwerp to receive the Bochum blooms, and the sellers had no right to notice of that which by the terms of their contract they already knew.

As to the transportation of the Rhenish blooms, it is contended by the plaintiffs that there was no specific provision made, and that the defendant was required to name the ship before the duty of delivery devolved upon them. It will be observed that the freight contract was not yet exhausted by the

deliveries made upon either or both lots of blooms, and the defendant contends that until this was exhausted no duty devolved upon him in this respect. But this contract was transferred by Sanders Brothers to Waterman & Co. in connection with the contract of November 17, 1879, and was then especially applicable to the Bochum blooms; it was in Sanders' hands for shipment of this particular lot of blooms, and in the absence of any other arrangement would we think, be regarded as a shipping direction or provision for that lot only, the contract for which Sanders Brothers at least had a right to regard as distinct and separate from that with Clark, Post & Martin. But the defendants contend that as alternate ports, Rotterdam and Antwerp, were named in the contract, and no particular time was designated for delivery of the blooms, the option was with the sellers to decide at which of the ports and at what time delivery would be made, and that the ship could only be named on notice from the seller that the blooms were ready and would be delivered at one or other of the ports named at a specified time.

The blooms were to be delivered f. o. b. vessel at the ports of Rotterdam or Antwerp during the months of December, January, February and March, then next ensuing; and upon notice from time to time that the blooms were in readiness it was the duty of the buyer to name the vessel; and he might, we think, have named the vessel in either port, and the seller would have been obliged to make the delivery accordingly; the delivery was to be made, not at Rotterdam or Antwerp, but on board vessel, whether the vessel was at Rotterdam or Antwerp. This would seem to have been the construction which the parties themselves put upon their contract. That this was the understanding of the parties to the original contracts cannot be doubted, and it is plain from the letter of March 5, 1880, written by Matthews, as the agent of Eckert, that he understood the contract in the same way. But the buyer was certainly entitled to reasonable notice of the time deliveries were to be made; it is unreasonable to suppose that it was in contemplation of the parties that the buyer should provide vessels and name them to the seller from time to time during the four months specified for delivery, upon an uncertainty; for he could not know when the seller might have the blooms

ready, and he was certainly not obliged to hold the vessels in readiness at all times during the entire period in mere anticipation of deliveries which might happen to be made; he was obliged, however, to hold himself in readiness to accept the blooms and to name the ship on reasonable notice : Armitage v. Insole, supra.

It seems from the facts found by the referee, that Sanders Bros. had some understanding with Waterman & Co., in virtue of which they, at the outset, undertook as matter of favor, to procure vessels. They were under the impression that they had authority to make shipping arrangements for the entire lot of blooms ; but both Eckert and Waterman & Co. repudiated this authority, and insisted that the arrangement referred to was provisional only, and applied to a certain exigency which was past; whereupon, on March 10, 1880, Clark, Post & Martin by letter notified Matthews, the agent of Eckert, as follows: " You must give positive instructions now as to the shipment of the balance that freight may not have been engaged for, as we will not accept or assume any responsibility in connection with the matter ; we agree to deliver the stuff f. o. b., and it is the purchaser's business to furnish vessels ; what we have done is simply from courtesy, and we have communicated to Sanders Mr. Waterman's instructions, etc." On March 16, 1880, they further instructed Matthews that they were awaiting instructions for shipment of certain blooms "lying at Antwerp; " that the goods "were quite ready awaiting shipment," etc. This would seem to have been the first notice that the blooms were, or would be, ready for delivery ; but they were at Antwerp, and, as we have already said, it was clearly in the contemplation of the parties that Eckert should name the port. As he had to provide the shipping and pay the freights, it was of the highest importance to him that the blooms should be delivered at the port which offered the best and cheapest facilities for shipping. Accordingly on March 18th, Matthews in Eckert's behalf instructed Sanders Bros., through Clark, Post & Martin, as follows: "I have been advised by parties here that freights are readily obtained from Rotterdam, and, in fact, they have been offered a contract to cover the whole balance to be shipped from that port; blooms at 13s. 6d. to Philadelphia or 12s. 6d. to New York or Baltimore. I therefore

desire that in your next cable you will advise Messrs. Sanders Brothers not to make the deliveries at Antwerp, at additional expense of 1*s.* 6*d.*, but make the shipments from Rotterdam at not exceeding that price before named; or in case they can't do that I am not in position to close the contract for the balance. Please give me your views on this subject, as you see it is a very serious matter to my principals, making a difference of some 3*s.* or 4*s.* per ton, which you know at the present time is a profit."

We agree with the learned referee that upon receipt of these instructions, it was the duty of Sanders Brothers and consequently of Waterman & Co., either to have the blooms at the port of Rotterdam and to ship them at the rates named, or to notify Eckert that the blooms were ready for shipment to that port, in order that he might name the vessel to which deliveries could be made. Receiving no reply whatever to the letter of March 18th and no notice of readiness to deliver at Rotterdam, Eckert might well suppose, under the particular facts of this case, that satisfactory arrangements had been made for shipping the blooms in accordance with his instructions.

Besides, Sanders Brothers were the shippers; the providing of vessels and the arrangements for transportation were to enable them to ship the blooms for Waterman & Co. Clark, Post & Martin were responsible to Waterman & Co., and Waterman & Co. to Eckert, for Sanders Bros.' default in the delivery, according to the terms and condition of their respective contracts; and it is plain that Sanders Bros. neither delivered the blooms on board vessel, in accordance with the instructions given through Clark, Post & Martin, nor did they give notice of their readiness to deliver them at Rotterdam, independently of these instructions, and for their default Waterman & Co. are liable to Eckert in this action.

It is true the instructions given through Clark, Post & Martin to Sanders Bros. were not exhibited to Waterman & Co., but Sanders Bros., as we have said, were the shippers, and as such represented Waterman & Co. It was not essential therefore, we think, that Waterman & Co. should have had actual knowledge of them. Sanders Bros. wholly disregarded their instructions and, having failed to comply with the shipping directions therein contained, they should have given notice of

their readiness to deliver at Rotterdam; then the duty of providing shipping would have devolved on Eckert. Upon an examination of the whole case we are constrained to accept the conclusions of the learned referee, and therefore

The judgment is affirmed.

No. 82. For the reasons fully expressed in our opinion filed at 83 January Term, 1886, Dwight, Exr. v. Eckert, this

Judgment is affirmed.