DAVIS et al. v. ALPHA PORTLAND CEMENT CO.

(Circuit Court, E. D. Pennsylvania. January 23, 1905.)

No. 46.

1. SALES—DELIVERY TO VENDEE—REQUISITES.

In the absence of a contrary agreement, the vendor is not bound to send or carry the goods to the vendee, but fulfills his obligations by leaving or placing them at the latter's disposal, so that he may remove them without lawful obstruction.

2. SAME—CONSTRUCTION OF CONTRACT—"F. O. B."

While the use of the phrase "f. o. b.," or an equivalent expression, in a contract of sale, prima facie imposes on the purchaser the duty of furnishing the cars or vessel upon which the goods are to be transported from the place of delivery, yet the whole agreement, when taken with its attending circumstances, or the construction of the contract by the parties, may shift the obligation of furnishing the cars or vessel upon the seller.

3. SAME—CONSTRUCTION BY PARTIES.

A contract of sale, providing for a number of successive deliveries, called for cement f. o. b. at a certain point. The sentence in which this provision appeared related to the price of the cement. The seller, in acting under this contract, always obtained the cars itself, and, in correspondence with the buyers concerning its failure to ship promptly, never alluded to the duty of furnishing the cars as resting upon the buyers. The buyers never obtained the cars, and both parties evidently regarded the duty of obtaining them as resting on the seller. Held that, in view of the construction placed upon the contract by the parties, it was the seller's duty to furnish cars for the shipment of the cement.

4. DAMAGES—LIQUIDATED DAMAGES—CONSTRUCTION OF CONTRACT.

A contract for the sale of cement provided that, if the seller failed to deliver a specified number of barrels, it should pay the buyers 15 cents per barrel as liquidated damages for each and every barrel short of the required number, and further provided that the seller would make all

shipments within 10 days after the receipt of orders. *Held* that, although the latter provision followed the stipulation for liquidated damages, that stipulation covered both the failure to deliver within 10 days from order, and the total failure to deliver.

5. SAME—LIQUIDATION OF UNCERTAIN DAMAGES.

It was competent for parties making a contract for a large quantity of cement, to be delivered at different times during an entire year, to stipulate for the payment of liquidated damages in case of the failure of the seller to ship the required amount of cement, where the experience of past years had shown that the price of cement fluctuated greatly, so that the damages which would actually result from a failure to deliver the cement at any time were uncertain.

J. Warren Coulston and John G. Johnson, for plaintiffs.

H. Gordon McCouch, Wm. A. Glasgow, Jr., and Alex. Simpson, Jr., for defendant.

J. B. McPHERSON, District Judge. This suit is brought to recover damages for the defendant's admitted failure to deliver cement in accordance with the contract contained in the following letters:

"December 21, 1901.

"Messrs. James A. Davis & Co., Boston, Mass.—Dear Sirs: Below we beg to confirm our verbal understanding had with your Mr. James A. Davis and Mr. Henry N. Fisher and our Mr. Gerstell in New York city on the 9th and 10th insts. viz.:

"In consideration of our agreeing to give you the exclusive sale of our Alpha Portland Cement in the New England States during the year 1902, you agree to purchase from us, 200,000 barrels of such cement at the following special prices, viz.:

"Alpha Portland Cement, 87½c. per bbl. in cotton;

"Alpha Portland Cement, $1.10 per bbl. in wood;

"All in car load lots f. o. b. Alpha, N. J. Terms 2% off cash in ten (10) days.

"We agree to deliver to you the above mentioned quantity of cement at the prices named, same to be ordered out monthly about as follows:

| | | | |
|---|---|---|---|
| January, | 8,000 bbls. | July, | 20,000 bbls. |
| February, | 10,000 bbls. | August, | 20,000 bbls. |
| March, | 10,000 bbls. | September, | 25,000 bbls. |
| April, | 15,000 bbls. | October, | 25,000 bbls. |
| May, | 15,000 bbls. | November, | 20,000 bbls. |
| June, | 15,000 bbls. | December, | 15,000 bbls. |

"It is further understood and agreed that in the event we should fail to deliver the 200,000 barrels of cement during the year 1902, barring strikes, fires and accidents or causes beyond our control, we will pay you 15c. per barrel as liquidated damages for each and every barrel short of the 200,000 barrels; and we agree to make all shipments to you within ten (10) days after receipt of orders, providing you do not call for shipment of more than 1000 barrels in wood and 3000 barrels in cotton per day.

"In the event you do not order from us the 200,000 barrels during the year 1902, it is understood and agreed that you will pay us 15c. per barrel as liquidated damages for each and every barrel short of the 200,000 barrels.

"It is further understood that in the event you do not order from us this year (1901) the quantity of cement mentioned in our agreement with you under date of December 31st, 1900, the difference between what you order and the quantity agreed upon to be taken out, viz.: 200,000 barrels, is to be taken out in addition to the 200,000 barrels mentioned above, which quantity is to be ordered out prior to the 200,000 barrels, and is to be billed to you at the following prices, viz.:

"Alpha Portland Cement 90c. per bbl. in cotton f. o. b. Alpha N. J.

"Alpha Portland Cement, $1.15 per bbl. in wood f. o. b. Alpha N. J.

"Terms 2% off for cash in ten (10) days.

"If the above is in accordance with our verbal understanding your signature under 'Acceptance' will constitute a contract between us, and on the return of this letter with your signature we will forward you your bond for $10,000 which was placed with us for the fulfillment of the agreement entered into, December 31st, 1900.

"Yours truly,                    Alpha Portland Cement Co.
                                 "By A. F. Gerstell, V. P.

     "Acceptance.
        "James A. Davis & Co."

                                      "December 23, 1901.

"Alpha Portland Cement Co., Alpha N. J.—Gentlemen: Please find enclosed contract for 1902 duly executed as requested by you. The only stipulation is regarding the monthly quantities as mentioned by you in the contract, which is of course elastic or in accordance with the demands of our customers. We will try to the best of our ability to be reasonable in this respect, and will you kindly pin this letter to the contract in order that there may be no misunderstanding in the future regarding this part of the contract.

"Kindly return to us at once our bond which was placed with you for the fulfillment of agreement for 1901 and oblige,

"Yours very truly,               James A. Davis & Co."

                                      "December 28, 1901.

"Mess. James A. Davis & Co., Boston, Mass.—Dear Sirs: Your favor of the 23rd inst. returning contract for 1902 duly executed is received, and we thank you for the same. I have instructed Mr. Brown to return you your bond.

"Yours truly,                    A. F. Gerstell, V. P."

At the trial the court reserved the question whether there was any evidence to go to the jury in support of the plaintiffs' claim, and the parties agreed upon the following special verdict:

"The jury finds a verdict for the plaintiffs for the sum of $88,150.14, with leave to the court to reduce the verdict to $19,243.52, if the court shall be of the opinion that, under the contract, plaintiffs should only be allowed to recover 15 cents per barrel as liquidated damages."

The questions for decision under the pending motions are, first, whether the plaintiffs are entitled to recover at all; and, second, if they are so entitled, for how much should the judgment be entered?

Upon the first question, the defendant's position is that, as the contract calls for cement "f. o. b. Alpha, N. J.," this provision required the plaintiffs to furnish the cars at that point, and their conceded failure so to do is fatal to the claim. Upon the undisputed evidence in the case, I am unable to agree with this conclusion. It is, no doubt, true, as a general proposition, that, to use the language of Benjamin on Sales (7th Am. Ed.) § 679:

"In the absence of a contrary agreement, the vendor is not bound to send or carry the goods to the vendee. He does all that he is bound to do by leaving or placing the goods at the buyer's disposal, so that the latter may remove them without lawful obstruction. And if the delivery by the vendor is to take place upon the doing of certain acts by the purchaser, the vendor is not in default for nondelivery, until notice from the purchaser of the performance of the acts on which the delivery is to take place. Thus, if the vendor agrees to deliver on board of the purchaser's ship as soon as the latter is ready to receive the goods, the purchaser must name the ship, and give notice of his readiness to receive the goods on board, before he can complain of nondelivery."

It is also true that in a number of cases—some of them will be referred to in a moment—the courts have decided that the phrase

"f. o. b.," or an equivalent expression, imposes upon the purchaser the duty of furnishing the cars or the vessel upon which the goods are to be transported from the place of delivery. In Kunkle v. Mitchell, 56 Pa. 100, the seller agreed to "deliver on the cars at Indiana, 75,000 feet of lumber at 85 cents per hundred feet," and concerning this clause the court say:

"This is the controlling clause as to the place of delivery. The cars would be either the cars of the plaintiff [purchaser], or those of the railroad company, and in either case they were to be provided by the plaintiff, and not by the defendant. The cars, therefore, being to be provided by the plaintiff, the duty was imposed upon him to show he was at least ready with the cars, or willing to provide them, and to have notified the defendant of such readiness and willingness."

In Dwight v. Eckert, 117 Pa. 490, 12 Atl. 32, the respective contracts contained the words "place of delivery, free on board, continental ports," "place of delivery f. o. b. Rotterdam," and "f. o. b. continental ports"; and the court, approving Kunkle v. Mitchell, declared it to be "a well-established principle of the law that, in a contract for sale and delivery of goods 'free on board' vessel, the seller is under no obligation to act until the buyer names the ship to which the delivery is to be made, for, until he knows that, the seller could not put the goods on board."

These two cases were followed by Hocking v. Hamilton, 158 Pa. 107, 27 Atl. 836, where the contract provided that "the price to be paid to party of the second part by party of the first part [purchaser] shall be for all good, clean, marketable coal, free on board railroad cars at tipple, as follows, that is to say, in hoppers and gondolas for run of mine coal 68 cents per ton of 2,240 lbs." This was construed to mean that the tipple was the place of delivery at which the purchasers agreed to receive and pay for the coal, and that "they were bound to furnish the cars for it, and the appellee was required to be ready and willing to deliver it there. As he was so prepared, and the latter neglected and refused to receive it, they became liable in damages for the nonperformance of their contract."

In Sheffield Furnace Co. v. Hull Coal & Coke Co., 101 Ala. 446, 14 South. 672, followed by Capehart v. Furman Co., 103 Ala. 671, 16 South. 627, 49 Am. St. Rep. 60, the meaning of "f. o. b." was said to be "a matter of common knowledge, and hence of judicial cognizance. * * * They import that the purchaser shall be free from all expense which may have attended the shipment and transportation to the point named. Had the provision related to the initial point of the transportation, the buyer would have been entitled to the shipment at that place free from all expense incident to loading the cars—all expense, indeed, incurred in the premises up to and including the loading of the cars. Then it would have been upon the buyer to pay the freight—the cost of transportation—to the final destination of the consignment. The provision here having relation to the point of final delivery, it can mean nothing else than that the seller is to pay all costs and charges up to that point, and that the buyer is entitled to receive the consignment free of all such costs and expenses."

In Chicago Lumber Co. v. Comstock, 71 Fed. 477, 18 C. C. A. 207, the language was, "Price for the above is $10.75 per thousand feet loaded on the cars;" and the court declared that the seller's duty was fulfilled when he had dressed the lumber which was the subject of the contract, and had loaded it upon cars furnished to him for that purpose. "It was the duty of the lumber company, under the contract, to see that cars were furnished."

But while this is the prima facie effect of the phrase, standing alone, the whole agreement, with its attendant circumstances, may disclose that a different meaning should be given, or the parties may give to the words whatever other effect they please. They may expressly provide that "f. o. b.," instead of meaning that the purchaser should furnish the cars or the vessel, should shift this obligation upon the seller, and they may substitute the one meaning for the other quite as effectively by their conduct as by their written or spoken words. In Coal Co. v. Schneider, 163 Ill. 393, 45 N. E. 126, a contract to mine and sell coal was declared by the Supreme Court of Illinois to be "silent in regard to the party who shall furnish the cars," although it contained the words "f. o. b. at said mine." But as the evidence at the trial showed that the purchaser had agreed to furnish them, and had actually carried out the agreement, this was declared to be a definite construction of the contract by the parties, that determined its meaning. The court said:

"From these facts it is apparent that the construction placed on the contract both by appellees and appellant was that appellant was required by the contract to furnish the cars. In the construction of a contract, it is always allowable to look to the interpretation the contracting parties place upon it, either contemporaneously or in its performance, for aid in ascertaining its meaning."

It was because of this construction of the contract by the parties themselves that the court afterwards declared it to be the duty of the purchaser to furnish the cars. In Neimeyer Lumber Co. v. Burlington Railroad Co., 54 Neb. 326, 74 N. W. 671, 40 L. R. A. 534, the words "Prices f. o. b. Omaha, Nebraska," were construed, in the light of all the evidence, to mean, not that the goods sold were to be delivered at Omaha, but that they would cost the purchaser the sum named when they reached Omaha, and the place of delivery was decided to be the point of shipment in the state of Arkansas. In Baltimore & Lehigh Railway Co. v. Steel Rail Supply Co., 123 Fed. 655, 59 C. C. A. 419, the contract called for delivery "f. o. b Pennsylvania Railroad cars, Baltimore & Lehigh Junction." But as the evidence showed that the seller had undertaken to obtain the cars, this was held by the court below to be a practical interpretation of the contract by the parties themselves, and this ruling was not disapproved by the Circuit Court of Appeals.

In the present case a similar interpretation seems to me to have been put upon the agreement under consideration. The defendant was making frequent shipments in fulfillment of the plaintiffs' orders, but always obtained the cars itself, never asking the plaintiffs to furnish them, and, although in frequent correspondence concern-

ing its failure to ship promptly, never alluding to any such duty as if it rested upon the plaintiffs. No attempt was ever made by the plaintiffs to obtain cars, and it was testified at the trial that they did not regard it as any part of their business. The following extract from the testimony of James A. Davis, one of the plaintiffs, shows clearly that both parties regarded it as the defendant's duty to furnish the cars:

"Q. The next difficulty or question which arose related to the car supply, did it not?.

"A. I think it did; yes, sir.

"Q. And so far as that matter was concerned, you first wrote to the defendant that you knew that there was difficulty in that regard, did you not?

"A. I heard that there was. I did not know it.

"Q. Did you not say you knew it?

"A. Maybe I said so in my letter. Possibly I did.

"Q. We do not want any doubt about that. This is a letter written by you, is it not? (Letter shown witness.)

"A. Yes, sir.

"Q. I read you the language embodied in it: 'We know perfectly well what a lot of trouble you have been having with the railroad company.' That is in there, is it not?

"A. Yes, sir.

"Q. Later on, however, in certain letters, you seem to question the fact of the difficulty in that regard, did you not?

"A. Yes, sir.

"Q. And you said in some of the letters later on that you knew that was not true, did you not?

"A. I think I did; yes, sir.

"Q. Did you know of your own personal knowledge, or from what somebody else told you?

"A. I guess, from what somebody else told me.

"Q. Then you did not make any attempt yourself, by inquiry of the railroad people, to get cars and send them to Alpha for the shipping of that cement, did you?

"A. To send them to Alpha?

"Q. Yes."

"A. No, sir.

"Q. And though other people had said to you, as you say, that cars could, be had, and though you were complaining because cement had not been sent to you on the ground that cars could not be had, you made no attempt personally, nor, so far as you know, did your partner make any attempt, to get cars sent to Alpha to load with cement to bring to you or send to your orders?

"A. That was no part of our business.

"Q. I do not want your reason. I want the fact.

"A. We did not.

"Q. You did not do anything of that kind, did you?

"A. We never did."

It is impossible to read the testimony—especially the letters that were offered in evidence—without being convinced that the defendant never entertained any idea that the plaintiffs were under the slightest obligation to furnish cars. And this reading of the agreement is in harmony with its natural construction. The sentence in which the words "f. o. b. Alpha, N. J.," appear, was concerned with the prices of the cement, and was intended to inform the plaintiffs that for the specified sums the defendant would load the cement on cars at Alpha without charge for the work of loading, so that the plaintiffs might know precisely for how much they must sell in order to make a profit. If it had been supposed that any

obligation to furnish cars rested upon the plaintiffs, it is most remarkable that such obligation is never once referred to during the constant correspondence and dispute concerning the defendant's failure to fill the plaintiffs' orders promptly, and that, while the plaintiffs never made any effort to obtain cars, the defendant assumed and discharged this somewhat difficult duty from the very first.

In my opinion, therefore, the verdict should be for the plaintiffs, and the remaining question is, in what amount?  The relevant paragraphs of the contract are as follows:

"It is further understood and agreed that in the event we should fail to deliver the 200,000 barrels of cement during the year 1902, barring strikes, fires, and accidents or causes beyond our control, we will pay you 15c. per barrel as liquidated damages for each and every barrel short of the 200,000 barrels; and we agree to make all shipments to you within ten (10) days after receipt of orders, providing you do not call for shipment of more than 1000 barrels in wood and 3000 barrels in cotton per day.

"In the event you do not order from us the 200,000 barrels during the year 1902, it is understood and agreed that you will pay us 15c. per barrel as liquidated damages for each and every barrel short of the 200,000 barrels."

As it seems to me, this language is clear and unambiguous, and fixes the defendant's liability for failure to deliver at 15 cents per barrel.  The plaintiffs argue that there are two distinct agreements in the first of these paragraphs—one, an agreement to pay 15 cents per barrel for failure to deliver; and the other, an agreement to make shipments within 10 days, which says nothing about damages for failure to fulfill this particular undertaking, and leaves them to be measured by some other standard.  I cannot assent to this proposition.  The whole sentence is to be read together, and, thus read, I think it provides for liquidated damages whether the defendant's failure to deliver was within 10 days or afterwards.  The fact that the provision concerning prompt delivery comes later in the sentence than the provision for liquidated damages does not seem to me to be important.  The parties were dealing with the subject of an ultimate failure to deliver, and it is evident that ultimate failure to deliver must include all preceding failures to deliver promptly. There is no claim to recover any special damage caused by the defendant's failure to deliver within 10 days.  The claim is for the difference between the contract price and the market price at the time of such failure, and this would lead to the somewhat remarkable result that if the defendant actually delivered, but was a day or two behind the time, it would often have to pay more than if it refused to deliver at all.  Of course, if the market declined below the contract price, the plaintiffs would not be complaining of failure to deliver; and it is clear, therefore, that the provision was mainly put in to meet the contingency of a rising market, when the defendant might be tempted to sell to others at the higher price. The second paragraph provides for the contingency of a falling market, when the plaintiffs might be reluctant to order with certain loss before them.  I do not understand that the validity of these provisions is disputed.  It is their scope about which the parties differ.  If they are supposed to be invalid, I shall content myself

with adding that the contract on this point seems to find abundant support in Sun Printing Co. v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, in which the Supreme Court has distinctly declared that it is the duty of the court always to enforce the contract when the damages are uncertain, and have been liquidated by an agreement. That they were uncertain is made clear, I think, by the following extract from the brief of plaintiffs' counsel:

"Plaintiff Davis testified (pages 20–2):

" 'Q. You said yesterday you had been engaged in handling Portland cement about twelve years, I think, was it not?

" 'A. Yes, sir.

\* \* \* \* \* \* \* \* \* \* \* \*

" 'Q. Were you during those years engaged in handling it upon contracts which ran through a year or thereabouts?

" 'A. Yes, sir.

\* \* \* \* \* \* \* \* \* \* \* \*

" 'Q. Was there much variance in the price of cement during those years?

" 'A. Yes, sir; quite considerable.

" 'Q. Sometimes the price would be above, and sometimes below, the contract price?

" 'A. Yes, sir.

\* \* \* \* \* \* \* \* \* \* \* \*

" 'Q. Notwithstanding the fact that there was an annual contract at a fixed price, the defendant in this case reduced the price to you during that year, did they?

" 'A. Of 1901?

" 'Q. Yes.

" 'A. I think they did; yes, sir.

" 'Q. And allowed you to have the cement at a price less than that for which you had contracted? That is right, is it not?

" 'A. Yes, sir.'

"Page 31:

" 'Q. Who did lose the money? Mr. Simpson says you know that the Alpha Company lost the money.

" 'A. What money?

" 'Q. The money on that reduction.

" 'A. The Alpha Cement Company; yes, sir. That is right.'

"The situation at the time of making the contract, then, was this: The parties were dealing in a commodity which fluctuated considerably in price; they were making a contract for a very large quantity of cement to be delivered through an entire year, when the variance might be, and in previous years had been, very great; and they were making it in the light of the fact that an allowance had to be made to plaintiffs if the price fell considerably below the contract price. The evidence fails to disclose any other facts affecting the situation. What, then, more natural than that the parties would desire to be saved from very serious loss in case history repeated itself, and the price rose or fell considerably?"

But it was argued further that, whatever the original contract may have been, it was modified by certain letters in September and October, and that this new contract contained no provision for liquidated damages upon failure to deliver. I shall not extend this opinion by quoting the letters written at that time. I have read them all with care, and, to my mind, they did not modify the contract in any respect. A good deal of confusion about orders and shipments had arisen, as was perhaps unavoidable in the fulfillment of such a contract; and it was finally agreed, as the shortest way out of the difficulty, to cancel all existing orders and take a

fresh start. Nothing else happened, so far as I can see, and there was no thought on either side that this resulted in making a new contract. The case of Grand Tower Mining Co. v. Phillips, 90 U. S. 471, 23 L. Ed. 71, is not in point. A contract to furnish 15,000 tons of coal each month, which gave the buyer the option to punish a failure to deliver by exacting as liquidated damages 25 cents for each ton not delivered, or to carry the deficiency over to the succeeding month, and require its delivery then, in addition to the proper quota of the second month, was there construed; and it was held that, when the deficiency was carried over, the clause for liquidated damages ceased to apply, and, on a second failure to deliver, the seller should be punished by the infliction of the usual damages. As Mr. Justice Bradley said, the election to carry the deficiency over "was a substitute for the liquidated damages of 25 cents per ton. With regard to that particular amount of coal, the rule for liquidated damages was at an end. The agreement did not carry it forward to the following month. It imposed upon the defendant the obligation, if the plaintiff so elected, to furnish the coal itself, instead of paying the liquidated sum. If not so, what was the option worth? It amounted to nothing more than the right of giving to the defendant another month to furnish the coal. Surely they would have had that right without stipulating for it in this solemn way." The present contract contains no such option, and I am unable, therefore, to see the relevancy of the decision.

The defendant's motion for judgment in its favor notwithstanding the verdict is refused, and it is now ordered that the clerk enter judgment upon the verdict for the sum of $19,243.52. To this order an exception is sealed to the plaintiffs, and also to the defendants.